# In the United States Court of Federal Claims

No. 01-680 C
Filed August 7, 2008
TO BE PUBLISHED

| | |
|---|---|
| JGB ENTERPRISES, INC., | ) |
| | ) |
| | ) Motion for attorneys' fees and |
| | ) expenses under the Equal |
| Plaintiff, | ) Access to Justice Act, 28 U.S.C. |
| | ) § 2412(d); Government's |
| v. | ) position lacked substantial |
| | ) justification; effect of claim on |
| THE UNITED STATES, | ) which plaintiff did not prevail; |
| | ) alleged duplication of effort by |
| Defendant. | ) attorneys; cost-of-living |
| | ) adjustment to cap on hourly |
| | ) rates; fees attributable to work |
| | ) of paralegals and other non- |
| | ) lawyers. |
| | ) |

Joseph A. Camardo, Jr., Camardo Law Firm, P.C., Auburn, New York, for plaintiff.

Meredyth D. Cohen, Trial Attorney, Franklin E. White, Jr., Assistant Director, Jeanne E. Davidson, Director, Jeffrey S. Bucholtz, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., for defendant.

**OPINION AND ORDER**

GEORGE W. MILLER, Judge.

This matter is before the Court on plaintiff's motion for an award of attorneys' fees and expenses pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d) (2000).  On November 20, 2007, plaintiff filed a motion for attorneys' fees (Pl.'s EAJA Mot., docket entry 100), seeking a total of $301,117.53 in fees and expenses.  Defendant filed a response on January 25, 2008 (Def.'s Response, docket entry 105).  Plaintiff filed a reply on February 25, 2008 (Pl.'s Reply, docket entry 108).  Also on February 25, 2008, plaintiff filed by leave of the Court a supplemental motion for attorneys' fees (Pl.'s Supp. EAJA Mot., docket entry 107), seeking an additional $4,398.00 in fees and expenses.  Defendant filed its response to the supplemental

motion on April 7, 2008 (Def.'s Supp. Response, docket entry 111), and plaintiff filed its reply on April 29, 2008 (Pl.'s Supp. Reply, docket entry 114).

## BACKGROUND

This Opinion and Order assumes familiarity with the decisions in *JGB Enterprises v. United States*, 63 Fed. Cl. 319 (2004); *J.G.B. Enterprises v. United States*, 497 F.3d 1259 (Fed. Cir. 2007); and *JGB Enterprises v. United States*, 71 Fed. Cl. 468 (2006).[1]  A brief summary of pertinent facts follows.

JGB was a subcontractor for Capital City Pipes, Inc. ("Capital City"), a presently insolvent company that was the prime contractor to the Government for certain hose assemblies to be used in military vehicles.  Troubles with payment by Capital City arose, and JGB refused to ship its product until a solution could be identified and applied.  Small Business Specialist Michael Taylor, whose job was to identify Defense Supply Center Columbus ("DSCC") contracting opportunities for small businesses such as Capital City, suggested to JGB and Capital City the possibility of direct payment by the Government to a bank account where the subcontractor's signature was required to release the funds as a solution to the payment problems.[2]  By letter dated April 13, 2000, Capital City requested that Contracting Officer ("CO") Phyllis Moore, third in a line of post-award contracting officers for the disputed contract 2508, modify the remittance address on the contract to a Chase Manhattan Bank account in Syracuse, New York.  The letter was conspicuously copied to JGB.  CO Moore testified that she understood the account to be one where funds would be directly sent or set aside for the subcontractor, JGB.  Moore made the requested changes to the remittance address by issuing amendment P00002 later in the day on April 13, 2000.  JGB shipped the bulk of the contract 2508 hose assemblies the next day.

On May 10, 2000, Phil Kover, a disbursing officer with the Defense Financing and Accounting Service ("DFAS"), notified CO Moore that DFAS wished to pay Capital City by check.  In order to do so, Mr. Kover needed CO Moore's authorization to change the remittance address and insert Capital City's name.  The next day, with amendment A00001 to modification P00002, CO Moore changed the remittance from the Chase Manhattan Bank account to read: "Capital City Pipes c/o Chase Manhattan Bank, P.O. Box 4911, Syracuse, N.Y. 13202."  No one notified JGB of the change.

---

[1]The case decided by the Federal Circuit includes periods in plaintiff's name (*J.G.B.*), whereas the cases decided by this Court do not include periods in plaintiff's name (*JGB*).

[2]Capital City and JGB subsequently entered into an escrow agreement and designated JGB's local attorney, Michael Kawa, as the escrow agent.  *JGB*, 63 Fed. Cl. at 324-25.

On May 18, 2000, DFAS sent a check payable to Capital City in the amount of $57,365.79, c/o Chase Manhattan Bank, Syracuse. DFAS sent an additional check to Capital City, c/o Chase Manhattan Bank, Syracuse on June 14, 2000, for deliveries under contract 2508. The bank informed JGB of the first check on May 26, 2000. Accompanying that first check was a letter from DFAS to Capital City dated February 4, 2000, stating that Capital City was indebted to the Government in the amount of $115,141.41 on a separate, unrelated contract and the Government would offset this amount against any unpaid invoice available if payment was not forthcoming within 30 days. This letter was the first notification JGB had of any possible offset. Had JGB known these facts prior to April 14, 2000, it would not have shipped the hose assemblies under contract 2508.

On September 28, 2000, JGB submitted a certified claim to the Contracting Officer for payment on contract 2508. In a letter dated December 5, 2000, CO Moore denied payment to JGB, maintaining that JGB was not in privity with the Government, nor a third-party beneficiary on contract 2508, and that the Government could properly offset debts owed by Capital City on unrelated contracts against the payments due Capital City under contract 2508.

JGB then filed a complaint in the Court of Federal Claims on December 4, 2001. After unsuccessful motions by the Government to dismiss, an unsuccessful motion by plaintiff for sanctions pursuant to Rule 11, and unsuccessful motions for summary judgment by both parties, trial was held on May 11 and 12, 2004.[3] This Court rendered its decision in *JGB Enterprises v. United States*, 63 Fed. Cl. 319 (2004), holding in pertinent part that JGB was a third-party beneficiary on contract 2508 and that the Government improperly offset Capital City's debts against payment due JGB under contract 2508. The Court directed the entry of judgment in favor of JGB in the amount of $101,223.99, and judgment was entered on December 22, 2004. On February 18, 2005, JGB appealed certain of the Court's rulings to the Federal Circuit and the Government appealed the Court's ruling on the offset issue. It did not appeal the Court's holding that JGB was a third-party beneficiary on contract 2508. On December 21, 2005, while the appeals were pending, JGB filed a motion with the Court of Federal Claims pursuant to Rule 60(b) of the Rules of the Court of Federal Claims ("RCFC"), seeking relief from the judgment. That motion was denied. *JGB Enters. v. United States*, 71 Fed. Cl. 468 (2006). On July 31, 2006, JGB moved in the Federal Circuit to voluntarily dismiss its appeal and that motion was granted on August 8, 2006. The Government continued to pursue its appeal on the offset issue, and on August 2, 2007, the Federal Circuit in *J.G.B. Enterprises v. United States*, 497 F.3d 1259 (Fed. Cir. 2007) affirmed this Court's holding that the Government's offset was improper.

JGB filed its EAJA application on November 19, 2007. The EAJA requires that a claimant submit "an itemized statement" with its application, "stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B).

---

[3]The case was transferred from Senior Judge Lawrence S. Margolis to the undersigned judge by order of January 23, 2004.

Pursuant to its itemized statement, plaintiff has requested that the Court award a total of $305,515.53.  Pl.'s EAJA Mot. at 19; Pl.'s Supp. EAJA Mot. at 33-34.

## ANALYSIS

The EAJA provides that:

> a court shall award to a prevailing party other than the United States fees and other expenses . . . incurred by that party in a civil action . . . including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A).

Under the EAJA, one is a prevailing party if the party "succeeded 'on any significant issue which achieves some of the benefits sought by the suit.'" *Loomis v. United States*, 74 Fed. Cl. 350, 353 (2006); *see also Davis v. Nicholson*, 475 F.3d 1360, 1363 (Fed. Cir. 2007) ("A party prevails in a civil action if he receives 'at least some relief on the merits of his claim.'") (quoting *Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Res.*, 534 U.S. 598, 603-04 (2001)).  Plaintiff contends that it is a prevailing party because it "succeeded in establishing its entitlement to full payment on Contract 2508 at both the trial and appellate levels," and "Contract 2508 represented more than two thirds of the value of JGB's claims." Pl.'s EAJA Mot. at 8.  Defendant concedes that plaintiff is a "prevailing party" for EAJA purposes.[4]  Def.'s Response at 8-9.  Defendant, however, argues that its position with respect to contract 2508 was substantially justified and plaintiff is therefore not entitled to an award of fees and other expenses under the EAJA.

I.    **The Government's Position Overall with Respect to Contract 2508 Was Not "Substantially Justified"**

The Government's position is "substantially justified" if it is "'justified in substance or in the main' - - that is, justified to a degree that could satisfy a reasonable person." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).  The burden rests on the Government to establish that its position was substantially justified. *Scarborough v. Principi*, 541 U.S. 401, 414 (2004).

---

[4] Defendant also concedes that plaintiff meets certain threshold eligibility requirements. Specifically, defendant concedes that plaintiff meets the eligibility requirements set forth in 28 U.S.C. § 2412(d)(2)(B)(ii), because JGB's net worth at the time it filed the complaint did not exceed $7 million and it had fewer than 500 employees.

Because "the court's inquiry must focus on the circumstances pertinent to the position taken by the [G]overnment on the issue on which the claimant prevailed," *Smith v. Principi*, 343 F.3d 1358, 1363 (Fed. Cir. 2003), the Court has confined its inquiry to the Government's position relating to contract 2508, including the offset issue. The Court "examines the entirety of the Government's conduct and makes a single finding as to whether the Government's position was substantially justified." *Manno v. United States*, 48 Fed. Cl. 587, 590 (2001). This examination encompasses the entirety of the Government's conduct with respect to the issues on which plaintiff prevailed, including action at the agency level as well as the litigation itself. *See KMS Fusion v. United States*, 39 Fed. Cl. 593, 597 (1997). For the reasons set forth in this Part I, the Court concludes that defendant's position at the agency level regarding JGB's status as a third-party beneficiary on contract 2508 was not substantially justified and that defendant's position at all levels with respect to the offset issue was not substantially justified. In view of the foregoing, the Court has concluded that the Government's position overall with respect to contract 2508 was not substantially justified.

## A.     JGB's Third-Party Beneficiary Status on Contract 2508

### 1.  Government's Position at the Agency Level

#### a. Amendment of P00002

Plaintiff characterizes CO Moore's amendment of P00002 as the Government's first action that was not substantially justified. Pl.'s EAJA Mot. at 11. Defendant responds that such action was necessary for DFAS to pay by check, and was therefore reasonable and substantially justified. Def.'s Response at 12. Although CO Moore gave final authorization for the amendment, it appears from the record that DFAS requested it. The knowledge and actions of DFAS are not related to CO Moore's final decision with respect to JGB's status as a third-party beneficiary on contract 2508. It is therefore unnecessary to determine the reasonableness of its actions. Moreover, CO Moore had the opportunity to resolve any issues presented by the amendment in her final decision. We are therefore concerned with the reasonableness of her final decision denying JGB's claim for payment as a third-party beneficiary on contract 2508.

#### b. DSCC's Final Decision

In arguing that DSCC's final decision denying plaintiff's claim on contract 2508 was substantially justified, defendant relies on the fact that, although CO Moore understood prior to the final decision that the Chase Manhattan Bank account was "an account where monies [would] be directly sent or set aside for [JGB]," *JGB Enterprises v. United States*, 63 Fed. Cl. 319, 329 (2004), she was not made aware of how funds could be withdrawn from the account.

The terms of the agreement between Capital City and JGB are not important here, however. Third-party beneficiary status is appropriate when the contract reflects "the express or implied intention of the parties to benefit the third-party." *Montana v. United States*, 124 F.3d

5

1269, 1273 (Fed. Cir. 1997) (quoting *Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994)). DSCC's final decision rested on its contention that JGB was not a third-party beneficiary on contract 2508 because the modifications to the remittance address requested by Capital City "did not show an express or implied intent to benefit JGB directly." Pl.'s EAJA Mot. Ex. I at 3. Plaintiff argues that CO Moore's knowledge of the account's purpose conflicts with her "claims of ignorance regarding JGB's allegations of non-payment and the attempts to remedy the situation" – claims that this Court found not to be credible. *JGB*, 63 Fed. Cl. at 327. Plaintiff contends that one can similarly infer that CO Moore's statements in her final decision with respect to her lack of knowledge of any intention by Capital City or DSCC to benefit JGB were similarly inaccurate. *JGB*, 63 Fed. Cl. at 327; Pl's EAJA Mot. at 12.

At trial, the Court found that CO Moore knew that the purpose of the account was for monies *to be directly sent to or set aside for* JGB and, furthermore, that the reason for changing the remittance address to the Chase Manhattan Bank account in Syracuse was "to remedy the subcontractor's concern about non-payment and assure that it would deliver the hose assemblies." *Id.* at 329. In light of that knowledge, the Court found that both DSCC and Capital City intended JGB to benefit directly from the modification of the remittance address. Given that finding, the Court concludes that CO Moore's denial of plaintiff's claim that it was a third-party beneficiary on contract 2508 was not substantially justified.

### 2. *Government's Position in Litigation*

JGB's status as a third-party beneficiary on contract 2508 was subsequently litigated before this Court, which held that, pursuant to "the Federal Circuit's reasoning in [*D & H Distributing Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1996)], JGB is a third-party beneficiary with respect to the remittance clause of contract 2508." *JGB*, 63 Fed. Cl. at 334. Defendant argues that its contrary position at trial was substantially justified because *D & H Distributing*, which defendant concedes was at the time of trial the "governing law regarding a subcontractor's third-party beneficiary status based upon a contract's remittance address," was nevertheless distinguishable because in that case the prime contractor and subcontractor were named as joint payees. Def.'s Response at 14-15.

However, in the Court's view, *D & H Distributing* was on point. The Federal Circuit in *D & H Distributing* reasoned that the plaintiff had standing as a third-party beneficiary because the entire purpose of the joint payment clause was to protect the subcontractor, D&H, by "giving it a right to control the disbursement of the contract proceeds and thereby to ensure that its invoice to CIM [the prime contractor] would be paid." *D & H Distrib. Co.*, 102 F.3d at 547. As this Court previously held, the rationale of *D & H* extends to the situation litigated at trial, where "the entire purpose of modifying the remittance clause was to provide protection for the . . . subcontractor by giving it the right to control the disbursement of the contract proceeds, and thereby ensure that its invoice to the prime contractor would be paid." *JGB*, 63 Fed. Cl. at 334.

The Court recognizes that "substantial justification is measured, not against the case law existing at the time the EAJA motion is decided, but rather, against the case law that was prevailing at the time the government adopted its position." *Bowey v. West*, 218 F.3d 1373, 1377 (Fed. Cir. 2000). In doing so, defendant makes much of the fact that *Flexfab, LLC v. United States*, 62 Fed. Cl. 139 (2004), *aff'd*, 424 F.3d 1254 (Fed. Cir. 2005), a case cited by this Court in its opinion in *JGB*, was decided *after* the trial of the underlying action. However helpful *Flexfab* was to this Court's analysis in *JGB*, the Court's holding in the underlying litigation did not depend upon the holding in *Flexfab*. Although *Flexfab* specified that a CO must know the purpose of a modification to a remittance clause in order to confer third-party beneficiary status on the entity designated in the remittance clause, it did not announce a new rule of law or change the relevant criteria for third-party beneficiary status. It was and is settled law in this circuit that "the appropriate test for intended third-party beneficiary status . . . [is] that the contract must 'reflect[] the express or implied intention of the parties to benefit the third-party.'" *Montana*, 124 F.3d at 1273. Someone with authority to bind the Government (as well as someone with authority to bind the other contracting party) must therefore have the intention of benefitting the third party; the Contracting Officer, when "acting within the scope of [her] authority is empowered to execute contract modifications on behalf of the Government." 48 C.F.R. § 43.102(a) (2007)[5]. Thus, although CO Moore knew the purpose of the modification of the remittance address, the more significant question is whether, with that knowledge, she had the intention to benefit JGB. This Court held that she did. *JGB*, 63 Fed. Cl. at 334.

Defendant argues that, even if its understanding of *D & H Distributing* were not reasonable, its litigation position regarding JGB's third-party beneficiary status on contract 2508 was substantially justified because the Court's decision in JGB's favor on that issue was largely based on the Court's determination at trial regarding CO Moore's credibility. For its part, plaintiff contends that documentary evidence available to the Government during discovery shows that CO Moore's statements regarding her lack of an intention to benefit JGB should have been more closely scrutinized in order to ascertain their bases before allowing her to testify as she did. Pl.'s EAJA Mot. at 13-14. However, in the Court's view, there is an absence of documentary evidence in the record that should have indicated to defendant that CO Moore might not have been entirely forthright. Our system relies on the adversarial process to bring such matters to light. Although counsel is obligated to make reasonable inquiry to ascertain that the factual contentions that he advances have evidentiary support, *see* RCFC 11(b)(3), the law does not require counsel to put his own client or witness through the third degree prior to permitting the client or witness to testify at trial. Indeed, because of the often unforeseeable nature of the adversary process, the fact that "the court's decision turned on observations and evidence that could only be obtained during trial . . . has been held to militate against an EAJA award." *Manno*, 48 Fed. Cl. at 591. Had CO Moore's testimony as to her lack of knowledge regarding the parties' intent to benefit JGB on contract 2508 proved credible, the determination of JGB's third-party status as to that contract might well have been different. Ultimately, the

---

[5]The operative regulation in the C.F.R. at the time of the modifications at issue here was identical to the current version. *See JGB*, 63 Fed. Cl. at 332.

Court's finding regarding the intent of the parties to benefit JGB turned on issues of witness credibility at trial.  Under these circumstances, the Government's position at trial – as distinct from its position at the agency level – cannot be deemed to have been unreasonable.  This Court is consequently of the opinion that defendant's position at trial with respect to JGB's third-party beneficiary status on contract 2508 was substantially justified.  As noted earlier, the Government did not appeal the Court's ruling on JGB's status as a third-party beneficiary on contract 2508.

> ### B.    The Government's Offset of Capital City's Debt Against Amount Due JGB

When DFAS did make payment on contract 2508 under the terms of the amendment, it offset certain debts owed to the Government by Capital City on an unrelated contract.  This Court held such action to be an improper offset, which is a deduction that "allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'" *JGB*, 63 Fed. Cl. at 335 (quoting *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995)).  Before exercising the offset, DFAS did not notify JGB of its intent to do so.  Defendant maintains that the offset was substantially justified at the agency level because the decision was consistent with case law at the time the action was taken and with DOD Financial Management Regulation 7000.14-R.[6]  Def.'s Response at 13.  Defendant also claims that the failure to notify JGB was entirely justified because the Government reasonably believed it was under no obligation to notify a party it considered to be lacking in privity of contract.  Def.'s Response at 14.  DFAS had previously notified Capital City of the possibility of an offset in its February 4 letter.

As far as the Government's actions prior to litigation are concerned, however, CO Moore's final decision denying plaintiff's claims and asserting the propriety of the offset is the primary focus of the inquiry.  Defendant contends that the final decision was substantially justified with respect to the offset because it was consistent with case law then in existence.  Def.'s Response at 14.  Plaintiff argues that case law and commonly understood hornbook law at the time of the final decision conclusively established that no offset ought to have been made.

---

[6]The DOD Financial Management Regulation sets forth, among other things, the administrative procedures for effecting offsets.  "FAR 32.611 allows for an offset of contractor debts as long as an explanation is provided to the contractor.  Offsets will be made against the same contract that gave rise to the debt provided that payments under that contract are scheduled.  Offsets against amounts due under other contracts will be accomplished only when offsets against the same contract cannot be accomplished."  DOD Financial Management Regulation 7000.14-R, Vol. 10, Chapter 18, para. 180403 (1996).  While this language supports the view that offsets against a contractor are generally allowable -- a view that has not been contested by plaintiff -- it does not speak to the issue at hand, *i.e.*, whether an offset may be made against a payment directed to a third-party beneficiary subcontractor on one contract, for a debt owed by the prime contractor under an unrelated contract to which the third-party beneficiary subcontractor was not a party.

Pl.'s EAJA Mot. at 12.   Because questions regarding the effect of applicable legal precedent on CO Moore's final decision bear directly on the reasonableness of the Government's position regarding the offset issue at the agency level, at trial and on appeal, the Government's positions at each of these stages are considered together.

"It is undisputed that the government has the right to offset debts owed to its contractor with a debt owed to it by the same contractor absent explicit contractual, statutory, or regulatory language stating otherwise." *J.G.B.*, 497 F.3d at 1261.   In this case, however, the Government sought to offset the debts owed by one contractor – Capital City – against debts owed to a different contractor – JGB – on a separate contract.   The issue is whether the position that the Government may offset a debt in such a situation was substantially justified.   Because CO Moore knew that payment on contract 2508 was to be set aside for JGB, *see* Section A(1)(b), *supra*, and for the reasons set forth below, the Court concludes that the Government's position regarding the propriety of the offset was not substantially justified.

Defendant argues that *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370 (1984) stands for the general proposition that "the promisor may assert against the beneficiary any defense that he could assert against the promisee if the promisee were suing on the contract." However, the Court in *Schneider* points out that this rule "should not be applied so inflexibly as to defeat the intention of the parties," indicating that the general proposition is inapposite when it conflicts, as it does here, with the parties' express or implied intentions.   The parties intended to safeguard the amount of money owed by Capital City to JGB in order to induce JGB to deliver the hose assemblies to the Government; in fact, the Government "had requested acceleration of deliveries under contract 2508 – meaning that the troops in the field urgently needed the supplies." *JGB*, 63 Fed. Cl. at 323.   There can be no serious debate that JGB would not have shipped the hose assemblies if it had known that payment due it would be subject to an offset on an unrelated contract between Capital City and the Government – a contract with which JGB had no connection and of which it had no knowledge.

Moreover, the language of *Schneider* unambiguously refers to defenses, not to claims such as offsets.   This Court held, and the Federal Circuit affirmed, that the offset was improper because offset is not a contract defense, but rather "a device that facilitates the efficient reconciliation of competing *claims* between the same parties." *J.G.B.*, 497 F.3d at 1261. Because the Government did not have a claim against JGB, it could not offset the amount of its claim against Capital City against the amount of the Government's payment due to JGB. *Id.* at 1262.   Defendant argues that the status of offset as a claim, and not a defense, was unclear prior to the Federal Circuit's holding in *J.G.B.*, noting that some earlier cases had referred to offset as a defense. Def.'s Response at 19; *see Madden v. United States*, 178 Ct. Cl. 121 (1967); *Fid. & Cas. Co. of New York v. United States*, 174 Ct. Cl. 1269 (1966).   That some courts may have been imprecise in dicta does not establish that the Government's position was substantially justified.   As the Federal Circuit explained, the legal theory underlying the use of offset is that two parties have competing claims; if there is no mutuality of indebtedness, there can be no right of offset. *See J.G.B.*, 497 F.3d at 1261.   The need for mutuality, and hence the distinct nature of

offset as a claim, is not a new concept.  *See Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 467 (1960) ("[T]he promisee's breaches will not excuse performance [by the promisor]; the promisor has an independent claim against the promisee in damages."); *Citizens Bank*, 516 U.S. at 18. Defendant asserts that *Lewis* – which characterizes offset as a claim – is applicable only to cases involving collective bargaining agreements.  However, the Federal Circuit's approach in *J.G.B.* simply makes explicit a proposition already well established even if the holding in *Lewis* were understood to apply only in the context of collective bargaining agreements.

The Government sought to offset Capital City's debts on an *unrelated contract* between Capital City and the Government against payment due JGB.  Defendant maintains that this position was substantially justified because no binding case law supported plaintiff's claim that such action against a third-party beneficiary was improper.  Plaintiff argues that the same want of precedent afflicted defendant's position.  In fact, however, all persuasive authority tends towards plaintiff's side.  *See Capuano v. United States*, 955 F.2d 1427, 1430 (11th Cir. 1992) ("It goes without saying that neither party may offset moneys in its hands belonging to some other party."); *United States v. York*, 909 F. Supp. 4, 9 (D.D.C. 1995) ("[O]ffset . . . would not obtain to the funds at issue here, which belong to a third-party beneficiary."); RESTATEMENT (SECOND) OF CONTRACTS § 309(3) cmt. c (1981) ("[T]he beneficiary's right is direct, not merely derivative, and claims and defenses of the promisor against the promisee arising out of separate transactions do not affect the right of the beneficiary except in accordance with the terms of the contract."); 9 CORBIN ON CONTRACTS § 46.5 ("Claims and defenses of the promisor against the promisee arising out of separate transactions are not available against the beneficiary unless the contract allows them."); 3 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS, § 10.9 (2004) ("Whether the beneficiary's (C's) right is subject to claims by the promisor (A) arising out of separate transactions with the promisee (B) is a different question from whether that right is subject to defenses and claims arising out of the contract itself.  The better view is that the beneficiary takes free of such claims unless the contract provides otherwise.")

Policy considerations also support the authorities relied upon by plaintiff and cast doubt on the reasonableness of the Government's position.  While such an offset may allow the Government to recoup money in a specific case, future subcontractors would be reluctant to work on a Government contract if they knew that full payment for goods they properly manufactured and delivered on time might be subject to an offset for unrelated debts of the prime contractor of which the subcontractor was unaware.  The availability of offset in such situations could seriously damage the long-term interest of the Government in obtaining the services of capable subcontractors.

For the foregoing reasons, this Court concludes that the position of the Government regarding the offset on contract 2508 was not substantially justified.

### C.     Relevance of Defendant's Alleged Failure to Produce Documents in Discovery

Plaintiff also alleges defendant did not produce in discovery and may have destroyed contracting files related to Purchase Order SP0750-00-M-4191 ("contract 4191")[7] and contract 2508.  Plaintiff argues that defendant's actions lend further support to a finding that defendant's position overall with respect to contract 2508 was not substantially justified.  Pl.'s Supp. EAJA Mot. at 2.

The dispute over the production of documents began at the deposition on January 8, 2008, of Ms. Kathryn Bader, a Contract Specialist formerly employed by the Defense Contract Management Command ("DCMC") in its St. Petersburg/Clearwater office that monitored and administered contract 2508, among other contracts.  The deposition was taken in the related case of *Kawa v. United States*, 77 Fed. Cl. 294 (2007).  That case remains pending.  Ms. Bader testified in her deposition that she had retained, for training purposes, certain contract 2508 files related to the assignment of claims procedure.  It is unclear whether she removed all files related to contract 2508 and exactly when she removed those files, but she apparently kept them in her desk through June 2004, at which point she moved to the DCMA[8] District East - Boston office and brought the files with her.  The files were turned over to plaintiff on January 24, 2008.

Defendant contends that there is a high probability that these files were turned over prior to the close of discovery.  Def.'s Supp. Response at 8.  Specifically, defendant points to the FOIA request JGB made in September 2002 for documents related to contracts administered by DCMC Clearwater, noting that because the documents responsive to the FOIA request were provided to JGB in early 2003, plaintiff should have had them prior to the May 2004 trial.  Def.'s Supp. Response at 8.  Defendant alternatively contends that even if the documents were never turned over to JGB, either during discovery or pursuant to JGB's FOIA request, the documents do not call into question the reasonableness of the Government's position with respect to contract 2508.  Def.'s Supp. Response at 7.  Plaintiff asserts that it did not receive these files in response to its FOIA request, stating that its FOIA requests were confined to information regarding sole source

---

[7]Contract 4191 was a related contract between Capital City and the Government.  As with contract 2508, JGB litigated its third-party beneficiary status on contract 4191, and the Court held against JGB on that issue.  *JGB*, 63 Fed. Cl. at 319, 334-35.  Thus, plaintiff is not a prevailing party regarding its third-party beneficiary status on contract 4191.  A full examination of the issues of alleged destruction of documents relevant solely to contract 4191 is unnecessary to the determination whether plaintiff is entitled to an EAJA award with respect to the issues on which it prevailed.  Thus, the Court focuses on the issues of alleged mishandling of documents relevant to contract 2508.

[8]Incident to a September 2000 reorganization of the Department of Defense, DCMC became the Defense Contract Management Agency ("DCMA").  The acronyms are therefore used interchangeably.

rationales, price or technical evaluations of Capital City, copies of contracts, pre-award surveys and documents evaluating the financial management or technical capabilities of Capital City. Pl.'s Supp. EAJA Mot. at 6. Plaintiff argues that because the files in question were primarily correspondence and other documents unrelated to the FOIA request, it is unlikely that JGB received the files pursuant to its FOIA request. Pl.'s Supp. EAJA Mot. at 6. Plaintiff also asserts that, even if it had received the files in response to its FOIA request, compliance with FOIA does not discharge a party's discovery obligations. Pl.'s Supp. EAJA Mot. at 6-7. Plaintiff further contends that the contents of the documents Ms. Bader turned over in January 2008 do, in fact, call into question the reasonableness of the Government's position with respect to contract 2508.[9] Pl.'s Supp. EAJA Mot. at 8. The Court has not found it necessary to evaluate that contention in view of its other findings with respect to the reasonableness of the Government's position.

As a threshold matter, it is unclear exactly what happened to these files and whether they were produced in discovery or in response to plaintiff's FOIA request. Defendant maintains that standard operating procedure regarding incoming claims at DSCC did not include notifying DCMC if, as here, the issue was related to payment.[10] Nor did the Government initially search DCMC files pursuant to JGB's discovery requests prior to trial, since, the Government contends, it reasonably believed all responsive files were located in DSCC's offices. Def.'s Supp. Response at 4. The Government's failure to produce contract documents in discovery, assuming it occurred, would be grounds for serious concern. Ms. Bader's admitted retention of official files in her desk – first in Clearwater and later in Boston – is especially problematic.

Of course, "[t]he Government bears the burden of showing that its position was substantially justified." *Manno*, 48 Fed. Cl. at 589. Because of the substantive deficiencies with the Government's position at the agency level and during litigation, even if defendant had acted reasonably in its handling of contract 2508 documents, that would not affect the Court's conclusion that the Government's position overall with respect to contract 2508 was not substantially justified.

## II.    Attorneys' Fees and Expenses Sought

### A.    Alleged Duplication of Effort by Attorneys

Plaintiff was represented at various stages of the underlying action by two different firms: Sonnenschein, Nath & Rosenthal ("Sonnenschein firm"), which primarily handled the litigation in this court; and the Camardo Law Firm, P.C. ("Camardo firm"), which handled the remainder of the dispute, including proceedings in the Federal Circuit. Defendant urges the Court to reduce

---

[9]Plaintiff also urges that it is possible that the documents held by Ms. Bader do not represent the entirety of the allegedly missing documents. Pl.'s Supp. EAJA Mot. at 9.

[10]DCMC's areas of oversight were primarily quality assurance, inspection and acceptance of products. Def.'s Supp. Response at 4.

the fees claimed because the work performed by the two firms may have been duplicative. "While duplication of effort is a proper ground for reducing a fee award, 'a reduction is warranted only if the attorneys are *unreasonably* doing the same work.'" *Jean v. Nelson*, 863 F.2d 759, 772-73 (11th Cir. 1988) (emphasis in original).

A review of the time records kept by both firms indicates that Sonnenschein's billing reflects the usual work of trial counsel -- preparing for trial, drafting motions and the like, while the Camardo firm's billing records reflect the work customarily performed by a client's general counsel, including basic legal research and review of documents available to the client. A client's interest may very well be best served when the client's general counsel recognizes that a different lawyer or firm has greater expertise in a relevant area of the law. Encouraging a client to retain a lawyer more experienced in complex or critical litigation is a common and commendable practice, and nothing in the billing records of the two firms indicates that either firm engaged in unreasonably duplicative work. Therefore, the Court finds that no reduction is warranted by reason of plaintiff's retention of the two law firms.

### B.      Recovery of Fees for Work Done by Non-Attorneys

Defendant highlights several entries from plaintiff's EAJA application that it contends either can only be recovered at cost to the attorney, or cannot be recovered at all. Those entries that defendant argues can only be recovered at cost comprise a total of 93.27 hours for a law clerk and for Adam Van Buskirk, a law school graduate who had not yet been admitted to the bar.[11] Def.'s Response at 28-29. Those entries that defendant argues cannot be recovered at all include 141.25 hours of work performed by Joseph Norris -- a cost analyst (not admitted to the bar) who helped the Camardo firm with such tasks as interest calculations and EAJA applications, and whose work was actually billed to JGB at an hourly rate of $75 or $100 -- and five hours of allegedly clerical work performed by J. Snyderman, D. Gerkin and A. Green. Def.'s Response at 29-31; Pl.'s Reply at 31. Defendant objects to the following eight tasks performed by these three individuals, the first three of which were billed at the rate of $100 an hour and the remainder of which were billed at the rate of $125 an hour: "Deliver filing to the U.S. Court of Claims;" "File Extension of Time for J. Hornyak at Court of Federal Claims;" "File pleadings for J. Hornyak at US Court of Federal Claims;" "Legal research re case status;" "Research re Defense Supply Center materials;" "Research re Defense Supply Center materials;" "Research for information about Defense Supply Center materials;" and "Assist with filing of pleadings at U.S. Court." Def.'s Response at 30-31.

The parties' briefs dealing with these issues were filed before the Supreme Court's ruling in *Richlin Security Service Co. v. Chertoff*, 128 S. Ct. 2007 (2008), which overruled the Federal Circuit's decision in *Richlin Security Service Co. v. Chertoff*, 472 F.3d 1370 (Fed. Cir. 2006), and held that under the EAJA, Richlin was entitled to recover fees for paralegal services at the

---

[11]The law clerk's work was billed to JGB at an hourly rate of $50; Mr. Van Buskirk's work was billed at an hourly rate of $100. Pl.'s EAJA Mot. at 5, 7.

market rate it paid for such services.[12]   The Supreme Court stated that "Richlin 'incurred' 'fees' for paralegal services," and that "a straightforward reading of the statute leads to the conclusion that Richlin was entitled to recover fees for the paralegal services it purchased at the market rate for such services." *Richlin*, 128 S. Ct. at 2012.  The Supreme Court found that "it would be anomalous to measure cost from the perspective of the attorney rather than the client," *Richlin*, 128 S. Ct. at 2013, and that the relevant inquiry is whether it is market practice to bill the services separately, thus providing a "prevailing market rate" metric.  *Id.* at 2016.  While *Richlin* established conclusively only that fees attributable to the work of paralegals are recoverable at the hourly rate billed to the litigant, here, just as "paralegals are more analogous to attorneys, experts, and agents than to studies, analyses, reports, tests, and projects," *id.* at 2013, the Court concludes that a law clerk, a law school graduate not yet admitted to the bar, and a cost analyst are analogous to attorneys, experts, and agents, and that the Supreme Court's reasoning with respect to services performed by paralegals similarly applies.

Thus, under the Supreme Court's holdings in *Richlin* and *Jenkins*, the hours billed by the law clerk and by Messrs. Van Buskirk and Norris are recoverable at the market rates at which those hours were billed to JGB.  Though none of those persons were admitted to the bar, all three provided labor contributing to the work product of plaintiff's attorney.  Their work was billed separately to the client, as an attorney's work would be, and this Court concludes that in light of the work these non-lawyers performed, it was reasonable to bill separately for their work and at the hourly rates in question.  For the same reason, the five hours of work performed by J. Snyderman, D. Gerkin and A. Green are also fully recoverable.  The filing of motions and pleadings with the court can be a sensitive task that requires training and experience beyond the merely clerical; likewise, professionals with legal training are often best suited to perform certain legal and factual research, and the fees attributable to such research in this case reasonably reflect that approach.  For these reasons, the Court holds that plaintiff may fully recover the fees attributable to the work of the law clerk and the other five individuals: Mr. Van Buskirk, Mr. Norris, J. Snyderman, D. Gerkin and A. Green.

_____

[12]The Court relied upon its decision in *Missouri v. Jenkins*, 491 U.S. 274 (1989) in holding that "attorney . . . fees" embraced paralegal fees as well.  In that case the Court stated that under 42 U.S.C. § 1988, the Civil Rights Attorney's Fees Awards Act of 1976, reasonable attorney's fees "must refer to a reasonable fee for the work product of an attorney.  Thus, the fee must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client; and it must also take account of other expenses and profit." *Id.* at 285.  The Court held that, because the statute provided for recovery of attorney's fees at "prevailing market rates," it followed that fees for paralegal services must be recoverable at prevailing market rates as well.  The *Richlin* Court determined that the "reasonable attorney's fees" described in 28 U.S.C. § 2412(b) were substantially the same as those described in § 1988. *See Richlin*, 128 S. Ct. at 2014 ("We think *Jenkins* substantially answers the question before us.").

14

### C.    Fees in Excess of Statutory Cap on Hourly Rates

The EAJA provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  28 U.S.C. § 2412(d)(2)(A)(ii).  Plaintiff requests attorneys' fees in excess of the statutory cap for the work of four individuals from the Sonnenschein firm, whose hourly rates ranged from $180.00 to $435.00.

Plaintiff contends that it is entitled to full recovery of fees beyond the statutory cap for one of these individuals, trial counsel Joseph Hornyak, because he possesses "distinctive knowledge or specialized skill needful for the litigation in question."[13]  *See Pierce*, 487 U.S. at 572.  In that regard, plaintiff points to Mr. Hornyak's expertise in government contract litigation.  The Court is not persuaded, however, that expertise in government contract litigation is the sort of "distinctive knowledge or specialized skill" that would support plaintiff's full recovery of attorneys' fees attributable to Mr. Hornyak's work.  *See Ace Constructors, Inc. v. United States*, 81 Fed. Cl. 161, 168 (2008) (suggesting that government contract expertise may not be the kind of "distinctive knowledge or specialized skill" contemplated by the Supreme Court).  Nor does Mr. Hornyak's expertise satisfy the statutory exception related to "the limited availability of qualified attorneys," which discounts even "an extraordinary level of the general lawyerly knowledge and ability useful in all litigation."  *Id.*  The Court therefore concludes that it is unable to award attorneys' fees in excess of the statutory cap attributable to the work of Mr. Hornyak.

Plaintiff alternatively requests a cost of living adjusted increase ("COLA") in the statutory cap.[14]  The Court has discretion to grant such an increase.  *Carmichael v. United States*, 70 Fed. Cl. 81, 85 (2006).  "Although defendant argues that plaintiff should not be granted a COLA because [plaintiff] has given no reason for it, this court 'has declined to impose a requirement that an applicant must do more than request such an adjustment and present a basis upon which the adjustment should be calculated.'"  *Id.* (quoting *California Marine Cleaning, Inc. v. United States*, 43 Fed. Cl. 724, 733 (1999).

---

[13]Plaintiff does not address the specialized qualifications of the remaining three individuals.  Consequently, the Court cannot determine whether they meet the statutory criteria for an award of fees in excess of the statutory cap.

[14]Although plaintiff did not explicitly request a COLA, it agreed with defendant's calculations that assumed such an increase and added that "[t]here should be no objection to the recovery of such amounts by JGB."  Pl.'s Reply at 28.  The Court concludes that plaintiff's actions were sufficient to constitute a request for a COLA.

Both parties agree with the *Carmichael* court that the proper calculation is obtained by comparing the March 1996 Consumer Price Index ("CPI")[15] to the CPI for each month during which an attorney billed hours.[16]  Defendant, however, excluded 0.5 hours in May 2002, 0.75 hours in August 2002, 0.75 hours in September 2002, 0.25 hours in April 2003, 2 hours in May 2003 and 0.75 hours in June 2003 for work this Court has concluded is recoverable.  Adding back these hours yields an additional $516.25.[17]  When this figure is added to the COLA calculation for the remainder of the hours billed by counsel for plaintiff, the sum is $98,902.21.

### D.    Impact of Claim on Which JGB Did Not Prevail

Defendant argues that, because plaintiff did not prevail on its claim related to contract 4191, there ought to be some reduction in the amount awarded.  The Court agrees that "the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee." *Hubbard v. United States*, 80 Fed. Cl. 282, 284 (2008).  What makes this situation difficult, however, is that the unsuccessful contract 4191 claim and the successful contract 2508 claim relating to JGB's status as a third-party beneficiary depended upon a common core of facts and similar legal theories.

 The Camardo firm's invoices identify its fees related solely to the work on contract 4191, and plaintiff does not request that defendant reimburse those fees.  Sonnenschein's invoices do not make a similar distinction, however.  Nevertheless, at least some of that firm's time must have been related solely to work on contract 4191.  The firm's work on contract 4191 was not identical in all respects to its work on contract 2508.

Because the litigation in this Court revolved around three sets of facts (the offset taken on contract 2508, third-party beneficiary status with respect to contract 2508, and third-party beneficiary status with respect to contract 4191), it may be said that contract 4191 comprised roughly one-third of the focus of the litigation.  However, because many issues were common to both contract 2508 and contract 4191 in terms of third-party beneficiary status, the Court estimates that roughly half of the time that was spent working on each of these areas should be

---

[15]March 1996 is the effective date of the amended statutory cap.

[16]Where COLA applies, the most accurate method appears to be produced by comparing the March 1996 consumer price index for urban consumers (CPI-U) to the CPI-U for each month an attorney billed hours.  The court then adjusts the $125.00 cap for a given month by the percent difference between the March 1996 CPI-U and that month's CPI-U, and multiplies the adjusted rate by the number of hours billed that month.  The attorneys' fees for each month are then added to determine the total award. *Carmichael*, 70 Fed. Cl. at 86.

[17]These hours are not subject to COLA, because they were all billed at an hourly rate of $125 or less.

considered as time spent working on issues that were relevant to both areas.  The Court's
approach is reflected in the table set forth below:

| Nature of Work | Fraction of Hours | Recoverable? |
|---|---|---|
| Work relating solely to offset issue (contract 2508) | 33% | Yes |
| Work relating solely to contract 2508 third-party beneficiary status | 17% | Yes |
| Work relating solely to contract 4191 third-party beneficiary status | 17% | No |
| Work common to both contracts 2508 and 4191 third-party beneficiary status | 33% | Yes |

Therefore, the Court finds that Sonnenschein's COLA-adjusted attorneys' fees, totaling
$98,902.21, should be reduced by seventeen percent, or $16,813.38, to a total of $82,088.83.
The fees billed by the Camardo firm are not subject to the same reduction because that firm
identified its fees related solely to the work on contract 4191 and did not include them in
plaintiff's EAJA application.

> ### E.    Additional Fees Incurred in Preparing the EAJA Application and
> ### Obtaining Payment of the Judgment

Plaintiff requests an additional $4,464.00 for fees incurred in preparing its EAJA
application and $3,753.00 for fees incurred in preparing its Supplemental EAJA application.
Because "attorney fees incurred in the preparation of an application for fees are compensible
under the EAJA," and because the requests comport with all other EAJA requirements, these
additional requests are granted.  *Schuenemeyer v. United States*, 776 F.2d 329, 333 (Fed. Cir.
1985).

Plaintiff also requests $645.00 for fees incurred in seeking to obtain payment from the
Department of the Treasury.  Defendant objects on the grounds that these fees were not incurred
until after the "last benefit" plaintiff received when the Federal Circuit affirmed this Court's
judgment.  *See Institutionalized Juveniles v. Sec'y of Public Welfare*, 758 F.2d 897, 920 (3d Cir.
1985) (holding that the time spent litigating the case after the "last benefit" is won from the
defendant cannot be recovered).  In this circuit, however, the rule is that "expenses of an attorney
that are not incurred or expended *solely or exclusively in connection with the case before the
court . . .* cannot be awarded under the EAJA."  *Oliveira v. United States*, 827 F.2d 735, 744

17

(Fed. Cir. 1987) (emphasis added).  Plaintiff's attempts to recover the money properly owed it as a result of the judgment in its favor were solely and exclusively related to the case before this Court.  It is well settled that fees incurred in the preparation of an EAJA application are recoverable, even though they too are incurred after what defendant characterizes as the "last benefit."  The Court is unable to perceive, and defendant has not proposed, a principled distinction between fees incurred in the preparation of an EAJA application and fees incurred in reasonable and necessary efforts to obtain payment by defendant in accordance with the Court's judgment.  Plaintiff's request for the recovery of additional fees in the amount of $645.00 is therefore granted.

## III.    Expenses Incurred in Prosecuting the Action

Defendant objects to plaintiff's inclusion in its EAJA application of expenses incurred for activities such as "duplicating," "delivery" and "facsimile" because plaintiff does not specify what was duplicated, delivered or faxed.  Def.'s Response at 31-32.  Plaintiff counters that the vast majority of the expense entries are specific.  Pl.'s Reply at 32.  When evaluating a claim for expenses, "[t]he quantum and method of proof of each allowable expense is discretionary with the trial court."  *Oliveira*, 827 F.2d at 744.  The specific entries objected to by defendant comprise a small percentage of the expenses claimed; the record reflects that the expenses in question were reasonably incurred in prosecuting the litigation.  They are therefore recoverable.

Defendant also objects to compensating plaintiff for computer research because the bills of plaintiff's counsel did not specify what research was conducted.  However, each expense listing for computer research pairs neatly with a separately billed attorney's fee describing the nature of the research.  The Court has calculated the sum of the Sonnenschein firm's expenses at $4,254.51.  Subject to the same seventeen percent reduction as applied to that firm's attorneys' fees, this leaves expenses of $3,531.24 to be added to the total of recoverable fees and expenses incurred as a result of Sonnenschein's work, equaling total fees and expenses attributable to the Sonnenschein firm of $85,620.07.  This figure, when combined with the fully recoverable $50,420.25 in fees attributable to work done by the Camardo firm,[18] yields a total recovery of

_____

[18]There is an approximately $60 inconsistency between this figure and the figure calculated by subtracting the fees requested by plaintiff in connection with its representation by the Sonnenschein firm from plaintiff's total EAJA request.  In light of this inconsistency, the Court has independently calculated the $50,420.25 figure by adding together the subtotals requested by plaintiff in connection with its representation by the Camardo firm at various points in the dispute.  Specifically, plaintiff requests $6,536.00 for fees of the Camardo firm incurred between JGB's receipt of the Contracting Officer's final decision and the filing of the complaint, $9,486.00 for fees incurred between the filing of the complaint and the decision of the Court, $25,536.25 for fees incurred after the trial Court's decision, $4,464.00 for fees incurred in the preparation of the EAJA application, $645.00 incurred in securing payment of the judgment in its favor and $3,753.00 incurred in preparation of JGB's Supplemental EAJA application.  Plaintiff does not appear to have requested any expenses incurred by the Camardo firm.

$136,040.32.  The calculation of the total amount recoverable by plaintiff under the EAJA is shown on the table set forth below:

| | |
|---|---|
| Recoverable Sonnenschein Fees | $82,088.83 |
| Recoverable Sonnenschein Expenses | $3,531.24 |
| Recoverable Camardo Firm Fees | $50,420.25 |
| **Total Amount Recoverable** | **$136,040.32** |

## <u>CONCLUSION</u>

JGB's application for fees and expenses pursuant to the EAJA is **GRANTED IN PART AND DENIED IN PART**.  The Clerk of the Court is directed to enter judgment in favor of plaintiff in the amount of $136,040.32.

**IT IS SO ORDERED.**

 s/ George W. Miller
GEORGE W. MILLER
Judge